**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

**JILL H. NOLAN,**                                  )
                                                    )
       Plaintiff,                              )
                                                    )
    vs.                                       )    **2:05-cv-1508**
                                                    )    **Electronic Filing**
**SWARTZ CAMPBELL, LLC,**                           )
                                                    )    Judge Cercone
       Defendant.                             )
                                                    )


## OPINION


Jill Nolan ("Plaintiff") commenced this employment discrimination suit against her

employer,  Swartz Campbell, LLC ("Defendant"), seeking redress for a hostile work environment

based on gender and her status as a working mother, disparate treatment, and retaliation.

Plaintiff's claims are brought pursuant to Title VII and the Pennsylvania Human Relations Act

("PHRA").  Presently before the court is defendant's motion for summary judgement.  For the

reasons set forth below, the motion will be granted.

In general, plaintiff claims that she was exposed to numerous inappropriate emails, jokes,

stories, and comments from her direct supervisor and did not receive a raise because she was

perceived and treated as unproductive and unprofitable due to her status as a part-time employee

with child care responsibilities.  She alleges the general attitude among individuals in

management reflected negative attitudes towards working mothers, and the firm condoned

various practices that were demeaning to women and stifled any efforts she made to market

herself or improve her productivity.  Defendant denies many of plaintiffs' allegations, noting that

a vast majority of them are not corroborated by any independent evidence beyond plaintiff's self-

serving testimony or recollection, and further argues that much of plaintiffs's evidence is based

on innocuous events and statements that are taken out of context.

Federal Rule of Civil Procedure 56 (c) provides that summary judgment may be granted

if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's claim, and upon which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. When the movant does not bear the burden of proof on the claim, the movant's initial burden may be met by demonstrating the lack of record evidence to support the opponent's claim. National State Bank v. National Reserve Bank, 979 F.2d 1579, 1582 (3d Cir. 1992). Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574 (1986) (quoting Fed.R.Civ.P. 56 (a), (e)) (emphasis in Matsushita). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

In meeting its burden of proof, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. The non-moving party "must present affirmative evidence in order to defeat a properly supported motion" and cannot "simply reassert factually unsupported allegations." Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989). Nor can the opponent "merely rely upon conclusory allegations in [its] pleadings or in memoranda and briefs." Harter v. GAF Corp., 967 F.2d 846 (3d Cir. 1992). Likewise, mere conjecture or speculation by the party resisting summary judgment will not provide a basis upon which to deny the motion. Robertson v. Allied Signal, Inc., 914 F.2d 360, 382-83 n.12 (3d Cir. 1990). If the non-moving party's evidence merely is colorable or lacks sufficient probative force summary judgment must be granted. Anderson, 477

U.S. at 249-50; <u>see also</u> <u>Big Apple BMW, Inc. v. BMW of North America</u>, 974 F.2d 1358, 1362 (3d Cir. 1992), <u>cert. denied</u>, 113 S.Ct. 1262 (1993) (although the court is not permitted to weigh facts or competing inferences, it is no longer required to "turn a blind eye" to the weight of the evidence).

The record as read in the light most favorable to plaintiff establishes the background set forth below. Plaintiff was hired by defendant in October of 2002 as a part-time workers' compensation attorney as part of defendant's effort to open an office in Pittsburgh. (SMF ¶12). It was agreed plaintiff would work three days a week, Monday, Wednesday, and Thursday. (SMF ¶6). Plaintiff's initial supervisor, attorney Stanley Winikoff ("Winikoff"), hired Plaintiff knowing that she wanted to work on a part-time basis and would be needing to take maternity leave because she and her husband were in the process of adopting a child. (SMF ¶6).

Plaintiff was the first attorney hired to handle worker's compensation matters in defendant's Pittsburgh office. Winikoff told plaintiff that eventually there would be more worker's compensation files than she could handle. Plaintiff had concerns about being able to handle the files and taking maternity leave as planned. She also recognized that other attorneys would have to be hired to handle all the anticipated worker's compensation work. (SMF ¶¶ 6,7). Bill Copetas ("Copetas") was hired as a second worker's compensation attorney. (SMF ¶ 17). Copetas was hired as a full time attorney. Plaintiff took at least eight weeks of maternity leave in 2003 and then subsequently took a second maternity leave in 2004 with the birth of her first natural child. (SMF ¶13; SMF ¶18). During the 2004 leave Copetas covered assignments for plaintiff. (SMF ¶ 18).

Plaintiff's initial wages in 2002 was $42 per hour without benefits. (SMF ¶10; CSF ¶174). In 2003, the year in which Plaintiff took her first maternity leave, she received a $4 per hour raise, increasing her wages to $46 per hour. (SMF ¶6; SMF ¶15). During that year plaintiff earned $38,909 and billed a total of 599.8 hours, resulting in total gross receipts for defendant of $71,461. (SMF ¶16). In 2004, the year in which plaintiff took her second maternity leave, she

earned $38,400 in wages, had 470.3 billable hours, and generated $48,515 in gross receipts for defendant. (SMF ¶20). Plaintiff was told she would be getting a $2 per hour raise at the end of 2004, but she never received such a raise. (SMF ¶18; SMF ¶30). In 2005, plaintiff's compensation was $55,156, her billable hours were 681.7, and her work generated $79,772 in gross receipts. (SMF ¶21). Defendant never gave plaintiff or any other attorney in the Pittsburgh office a specific billable hour requirement and during the years in question the gross receipts generated by Plaintiff exceeded her salary. (CSF ¶23). Plaintiff was told she had no billable hour requirement and had no expectation that her ability to receive a raise would be tied to her production of billable hours. (SMF ¶ 25; CSF ¶¶ 24-25). Plaintiff received a weekly computation of her billable hours and the firm receipts based on those billings, but she did not know why she was receiving such information and did not save such information. (SMF ¶ 27).

In December 2004, Winikoff advised Plaintiff she would be receiving a raise of $2 per hour, which would have increased her wages to $48 per hour. (CSF ¶182). Plaintiff's did not receive the raise in her January 2005 paycheck. (CSF ¶182). Plaintiff felt she was entitled to the raise. (SMF ¶ 28). When she asked Winikoff about the discrepancy, Winikoff explained that the Compensation Committee had denied his request to raise Plaintiff's hourly rate because she was perceived as unproductive and not profitable. (SMF ¶38; CSF ¶30). During this conversation Winikoff indicated that one of the reasons conveyed for her unproductiveness was her part-time status as a working mother, which was evidenced by a comment made by Charles Katz ("Katz"), a partner in defendant's Philadelphia office. (CSF ¶30). Winikoff told Plaintiff that Katz had asked him"what can we do to make sure she [plaintiff] doesn't come back from maternity leave, because when women have babies they lose their focus." (Plaintiff's Brief in Opposition to Summary Judgment, pg. 2; CSF ¶30). Katz was not a member of the Compensation Committee in 2004 and did not have any direct participation in the Committee's decision about whether to give plaintiff a raise. He may have had indirect influence with members of the Committee because he was a partner, had been on the Compensation Committee in years past, and had been

4

in charge of marketing in the recent past. (SMF ¶40-42; CSF ¶41-42). Other than plaintiff's recollection of the Katz' comment as recounted by Winikoff, plaintiff has no direct or circumstantial evidence suggesting or implying that Katz exercised any such influence with regard to the setting of her wages for 2005.

In February of 2005 plaintiff mailed a memorandum to Barry Mulher ("Mulher"), a member of defendant's compensation and management committees, complaining of an offensive email that Winikoff had forwarded to her seven weeks earlier on December 20, 2004. (SMF ¶31; SMF ¶43). The email, which contained "inappropriate sexually oriented material," violated defendant's sexual harassment policy. (SMF ¶108; CSF ¶213). Plaintiff's failure to receive a raise admittedly contributed to her decision to report the December 20, 2004, email. (CSF ¶52). After plaintiff was told that she was not profitable because of her status as a part-time working mother, she determined that Winikoff's email was another example of how defendant treated women and working mothers. (CSF ¶52).

Defendant maintained Human Resources policies and procedures that contained an equal opportunity and non-discrimination policy, which directed an employee to make any complaints about conduct in violation of the policy to a management committee member or to the Director of Human Resources. (SMF ¶55). Plaintiff was familiar with the policy and the mandated procedures thereunder. (SMF ¶55). Mulhern, a management committee member, first attempted to respond to plaintiff's February 2005 memorandum on April 28, 2005. Plaintiff was unavailable and Mulhern left a message on her voice mail. On May 23, 2005, Mulhern scheduled a meeting with plaintiff for May 27, 2005. (SMF ¶56-58).

During the May 27, 2005, meeting plaintiff explained that she had received between five and eight other offensive emails from Winikoff prior to December 20, 2004, but she had not retained those emails. (SMF ¶63-65). Plaintiff did produce one other offensive email that Winikoff had sent to Karen Pepke, a former secretary, in October of 2004. (SMF ¶62). In addition to the emails, she explained that she had perceived some of Winikoff's actions and

words as offensive as well. (SMF ¶71).

Specifically, Plaintiff informed Mulhern about instances in which Winikoff had commented on her physical appearance, told sexually explicit stories, or made her uncomfortable through his actions. (SMF ¶71-76). Plaintiff told Mulhern about an instance in which Winikoff explained to a group of women, including plaintiff, graphic details of his exploits in hiring prostitutes when he was younger. (CSF ¶185). Plaintiff also complained of comments that Winikoff made, including his reference to her as "the lovely Jill Nolan," which he on occasion made while on the phone with a client. (SMF ¶74). Additionally, plaintiff recalled an instance at a marketing event in which Winikoff put his arm around Plaintiff and whispered in her ear, making her uncomfortable. On another occasion Winikoff had remarked to Katz that "Jill is a strong woman. I really like strong women." (CSF ¶187; SMF ¶84). While planning to attend another marketing event, plaintiff asked what she should do and Winikoff told her to "just show up and smile pretty." (CSF ¶184). The comment was made in front of a client. (CSF ¶184). On yet another occasion, Winikoff told plaintiff that she looked "lovely in the sunshine"while she was in his office for a meeting and directed her not to close the window blinds. (CSF ¶188). Also, plaintiff reported that Winikoff had promised her a raise and then told her that the Compensation Committee referred to her as unprofitable and Katz had made a negative comment to Winikoff in the past about working mothers. (SMF ¶71).

Prior to meeting with Mulhern, Plaintiff had never told Winikoff that she perceived his behavior as offensive. Nor had she alerted Human Resources or a member of the Management Committee about any of these events. (SMF ¶77; SMF ¶86-87). She likewise never complained to Winikoff or anyone else in management about receiving offensive emails; nor did she talk to or complain to other recipients about receiving them. (SMF ¶¶ 68, 70, 77).

In addition to these occurrences, Plaintiff also recalled two other instances that occurred while she was under Winikoff's supervision. First, on February 14, 2005, Winikoff referred to a candidate for a vacant secretarial position as "slow" and commented that "she...looks like a

slug." (SMF ¶89). Second, Katz called Plaintiff and requested her to change her voice-mail greeting so that callers would not be informed of her part-time status; during this conversation Katz did not explicitly tell plaintiff he did not approve of her part-time working arrangement and plaintiff continued to work part-time thereafter. (CSF ¶179). Plaintiff was unable to recall any other instances when Winikoff made inappropriate or offensive comments or engaged in other conduct she found to be offensive. (CSF ¶¶ 81, 85).

Even though marketing was not a requirement of Plaintiff's job, plaintiff periodically attempted to market her services by sending emails within the firm asking for work, asking about ways to obtain work from the firm's existing clients and contacting individuals outside the firm in order to gain additional work. (CSF ¶¶ 98, 112). Plaintiff participated in an October 2004 conference with Lombard and Deb Matherne as part of developing a worker's compensation plan for the Pittsburgh office. (SMF ¶114). Plaintiff initiated the call through the assistance of Winikoff, and a partner, Jane Lombard ("Lombard"), indicated she would talk to Katz about implementing plaintiff's suggestions. (CSF ¶ 114). Plaintiff attempted in other ways, both before and after her meeting with Mulhern in May of 2005, to increase her billable hours through her marketing efforts, and specifically sought to obtain a client contact with Home Depot, which was one of Winikoff's clients. (CSF ¶196). Plaintiff was not informed until January of 2006 that the firm would have a conflict with such an arrangement because of its representation of Lowe's, a Home Depot competitor. (CSF ¶196).

Additionally, in 2004, while plaintiff was going through a high risk pregnancy with her second child, Lombard learned that plaintiff was not planning on attending a scheduled hearing because of a doctor's appointment. Lombard called plaintiff and told her to cancel the doctor's appointment and attend the hearing. (CSF ¶181). Plaintiff explained that it was an emergency appointment, and Lombard responded that "if you're that high risk, they'll see you any time, you must go to the hearing." (CSF ¶181). Although Plaintiff ultimately was able to keep her appointment, she felt that Lombard's directive evidenced discriminatory amicus against her

status as a part-time working mother. (CSF ¶181). Plaintiff was not prohibited from scheduling doctor's appointments during her working hours, and although she did so infrequently, she did so on a few other occasions. (SMF ¶¶ 106, 107).

Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") on June 13, 2005. (SMF ¶95). She charged she was subjected to a hostile work environment and defendant discriminated against her on the basis of her status as a part-time working mother. (SMF ¶98). Defendant decided not to renew Winikoff's employment contract at the end of 2005. (CSF ¶175). Plaintiff nevertheless continued to work for defendant on a part-time basis until March of 2007, at which time she resigned and filed a new charge based on a constructive discharge. (CSF ¶193).

Plaintiff claims she was subject to retaliation on several occasions after complaining to Mulhern and filing her EEOC charge. One such incident occurred shortly after she filed her charge, when Winikoff entered her office and began yelling about the assertions she made in the charge. (CSF ¶192). Another incident occurred in December of 2005 when Jeffery McCarron ("McCarron"), a partner at the Philadelphia office, had a discussion with plaintiff to determine what issues if any remained after Winikoff's departure. The discussion touched on plaintiff's relationship with coworkers after she had filed her complaint. Plaintiff retained an understanding that she was resented by her fellow workers for having filed the suit and McCarron said that "if he were [plaintiff], he would have quit and would not be working at the firm." (CSF ¶193; Reply to CSF ¶ 200). McCarron testified that he said in response to plaintiff's expressed concerns about strained relationships with coworkers that "if your so unhappy, why would you want to continue working at the firm?" (RCSF ¶ 200). Plaintiff also broached the rumored "Katz" statement about women loosing their focus after they have babies. McCarron dismissed the statement as being silly or stupid. McCarron further indicated that such a comment would not have had anything to do with plaintiff not receiving a raise in January of 2005, because Katz was not on the Compensation Committee nor was he on the Management Committee or plaintiff's

supervisor. (CSF ¶200; RCSF ¶ 200).

Lombard came to review plaintiff's files after she made a complaint to McCarron at their December 2005 meeting that she was not receiving enough work to make her profitable. Lombard was plaintiff's supervisor at the time and also the head of worker's compensation, and thus had the right to do so. Upon inquiry, Lombard indicated she was also going to review Copetas' files as well, but she did not review his files. Copetas never complained about not having enough work to do. (CSF ¶ 194; RCSF ¶ 194). After the December 2005 meeting with McCarron, plaintiff received additional worker's compensation assignments. She rejected at least one assignment and had days where she was slow but did not voice a concern about it to anyone in management. (CSF ¶ 210; RCSF ¶ 210).

Copetas received a GAB Robbins account from Attorney Pauciullo. Attorney Pauciullo directed Copetas to handle the file because he had prior experience with the adjuster. Copetas also received some SRS cases directly, although plaintiff and Copetas previously had divided SRS cases based on a geographical division they had agreed to among themselves. Copetas received a Lowe's file from Lombard with direction for him to handle that specific file and develop a budget estimate for the case. Copetas took the opportunity to announce through an office email that per Lombard he was to handle all new Lowe's files, notwithstanding that Lombard's email assigned only the one specific file to Copetas. Plaintiff did not question Copetas about his self-asserted position of control over incoming Lowe's files. (CSF ¶ 197; RCSF ¶ 197). She did send an email to Lombard asking if there was anything wrong with her work, but did not receive a response to it.

Plaintiff offered to assist with asbestos work. John Argento, a Philadelphia partner, thanked plaintiff for her email offer. Plaintiff did not thereafter talk to Argento about such work. When asbestos work was not provided to plaintiff, she formed the belief that her offer of assistance had been rejected or ignored. (CSF ¶ 198; RCSF ¶ 198).

Lombard complained to McCarron that plaintiff's part-time schedule was not conducive

to Lombard's staffing needs and plaintiff did not maintain any flexibility in her schedule. McCarron learned that part of this was attributable to child care issues. McCarron formed the belief that plaintiff's constraints were extreme as compared to other attorneys with constraints resulting from the need to provide child care. Plaintiff did occasionally change her schedule of working days when needed, but could not recall how often she had done so in the recent past. (CSF ¶¶ 202, 203; RCSF ¶¶ 202, 203).

Title VII of the Civil Rights Act of 1964 prohibits discrimination "against any individual with respect to [his or her] compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000 e-2 (a) (1). The prohibition "not only covers 'terms' and 'conditions' in the narrow contractual sense, but 'evinces a congressional intent to strike at the entire spectrum of disparate treatment of [protected employees] in employment." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78 (1998) (quoting Meritor Savs. Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986)). "Title VII is violated 'when the workplace is permeated with discriminatory [gender-based] intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."" Ocheltree v. Scollon Productions, Inc., 335 F.3d 325, 331 (4th Cir. 2003) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). Employees are entitled to protection from "working environments [that are] so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers." Meritor, 477 U.S. at 66 (quoting Rodgers v. EEOC, 454 F.2d 234, 238 (5th Cir. 1971)).

Specifically, a prima facia case of a hostile work environment has the following elements: (1) the employee suffered intentional discrimination because of a protected trait; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability. Abramson v. William

Paterson College of New Jersey, 260 F.3d 265, 276-77 (3d Cir. 2001). Proffering sufficient evidence to meet each element of a hostile work environment claim generally precludes summary judgment in the defendant's favor and permits the plaintiff to proceed to trial. Id. at 280-281.

In analyzing whether a plaintiff has established a prima facia case, the court cannot confine its analysis to "the individual pieces of evidence alone," but must "view the record as a whole picture." Id. at 276 (citing Woodson v. Scott Paper Co., 109 F.3d 913, 921 (3d Cir. 1997)). This is because "[a] play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but the overall scenario." Id. (quoting Andrews v. City of Philadelphia, 895 F.2d 1469, 1484 (3d Cir. 1990)).

Plaintiff has failed to advance sufficient evidence from which the finder of fact could conclude that her workplace was permeated with "intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." More specifically, the record fails to contain sufficient evidence to support findings in plaintiff's favor on a number of elements. These include the first, second and fourth elements as set forth above.

First, there is virtually no evidence that plaintiff was singled out for disparate treatment or treated differently because of her sex and/or her status as a working mother. Of course, a plaintiff need not produce direct evidence of an actor's motivation for conduct that can be found to be discrimination. Abramson, 260 F.3d at 278. In this regard it is improper to parse through the plaintiff's evidence in search of a link between the harasser's conduct and a discriminatory animus in his or her mind. Id. at 277-78. Instead, "[t]he proper inquiry at this stage [is ascertaining] whether a reasonable factfinder could view the evidence as showing that [the plaintiff's] treatment was attributable to her [sex]." Id. at 277. In this context a plaintiff is not "required ... to demonstrate direct proof that her harasser's intent was to create a discriminatory environment." Id. at 278. Instead, the intent to discriminate can be inferred from the entire

context in question and the conduct of the actors involved. Thus, "[r]egardless of what a harasser's intention is, if a plaintiff presents sufficient evidence to give rise to an inference of discrimination by offering proof that her 'work-place is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and the conduct is based on one of the categories protected under Title VII, a hostile work environment claim will survive summary judgment." Id. at 278-79. In other words, "where ... the evidence tends to show that the harasser's conduct was intentionally directed toward the plaintiff because of her sex, the first prong of the prima facia case is met." Id. at 279.

Of course, the proffered conduct or statements need not be explicitly sexual to meet this element. See Andrews, 895 f.2d 1485 ("[t]o constitute impermissible discrimination, the offensive conduct is not necessarily required to include sexual overtones in every instance or that each incident be sufficiently severe to detrimentally affect a female employee"); Durham Life Ins. Co. v. Evans, 166 F.3d 139, 148-49 (3d Cir. 1999) (facially neutral mistreatment is often an important component of a hostile work environment); Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1083 (3d Cir. 1996) (acts of harassment motivated by discriminatory animus can create a hostile work environment regardless of their content). "All that is required is a showing that [sex] is a substantial factor in the harassment, and that if the plaintiff had been [a male] she would not have been treated in the same manner." Aman, 85 F.3d at 1083.

Plaintiff has advanced evidence that Winikoff distributed between five and eight emails that contained derogatory jokes and off-colored, demeaning or negative sexual depictions or comments based on gendered stereotypes of men and women. For example, in the email as proffered by plaintiff, Winikoff forwarded to plaintiff and four other females an email circulated among other members of the firm identified as "BAAAD BREAKUPS." Attached were three or four images purportedly depicting the destruction of property (the spray painting or loss [presumably through divorce] of a sports car) or the public humiliation of a person (the areal

display of a banner commenting on the size of a man's penis) that presumably followed indiscretions involving infidelity. Also included was a picture of a telephone message pad depicting the naked backside of four individuals standing up and side-by-side with a line beneath reading "guess which asshole called." Finally, there was a cartoon of an executive stamping everything with a stamp containing a common vulgarity. Plaintiff acknowledged that of the several emails forwarded by Winikoff, this array of images was the most offensive.

While the emails as identified and described by plaintiff were no doubt crude and could be viewed as vulgar, there is nothing about their content to suggest they were forwarded to plaintiff with an intent to demean, humiliate, ridicule or intimidate her in particular because of her sex or gender. There were no sexual propositions, innuendo, pornographic materials or sexually derogatory language directed at plaintiff. <u>Compare</u> <u>Andrews</u>, 895 F.2d at 1482 n. 3 ("The intent to discriminate on the basis of sex in cases involving sexual propositions, innuendo, pornographic materials, or sexual derogatory language is implicit, and thus should be recognized as a matter of course. A more fact intensive analysis will be necessary where the actions are not sexual by their very nature."); & 1485-86 ("Obscene language and pornography quite possibly could be regarded as highly offensive to a woman who seeks to deal with her fellow employees and clients with professional dignity and without the barrier of sexual differentiation and abuse.") (citations omitted)). And while circulating such images is certainly inappropriate in the workplace, engaging in such conduct on five to eight occasions over twenty-six months falls far short of providing significant evidence to support a finding that plaintiff suffered intentional discrimination because of her sex or gender.

Winikoff's other behavior, although directed at plaintiff in particular, likewise is insufficient. Winikoff told an occasional story that relayed past historical events involving sexually risque conduct from his younger days. He commented on plaintiff's physical appearance in complementary fashion in a setting that possibly had an inkling of sexual connotation, and at times he did this in front of others (at least verbally). He put his arm around

her at a firm event and whispered an innocuous, private comment in her ear. And he commented negatively about a potential female candidate's mental ability and physical appearance. Again, while this conduct may well have been inappropriate for the workplace setting, it does not rise to the level needed to invoke the remedial machinery of Title VII.

The Supreme Court's cases in the area have taken "a middle path between making actionable conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury." Harris, 510 U.S. at 21. Striking such a balance is necessary to maintain the distinction between objectively hostile or abusive work environments that violate Title VII's broad rule of workplace equality and simple teasing, offhand comments and isolated incidents that are beyond its reach. Harris, 510 U.S. at 21; Clark County v. Breeden, 532 U.S. 268, 271 (2001). The Court has emphasized that the standards for judging hostility must remain sufficiently demanding so that Title VII does not become "a general civility code." Faragher, 524 U.S. at 788. "Properly applied, [the applicable standards are designed to] filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." Id. (citations omitted); accord Weston v. Pennsylvania, 251 F.3d 420, 427 (3d Cir. 2001) ("the mere utterance of an epithet, joke or inappropriate taunt that may cause offense" is not actionable under Title VII).

Winikoff's sporadic sending of emails containing off-colored jokes and his expressions and gestures cannot supply the affirmative factual underpinnings plaintiff needs to have the finder of fact conclude that she suffered intentional discrimination because of her sex or gender. Considered as a whole and in combination, they simply reflect what can only be characterized as "the ordinary tribulations of the workplace."

The circumstances surrounding plaintiff's failure to obtain a $2.00 an hour raise in January of 2005 do not jettison plaintiff's evidence of the environment into the realm of extreme conduct that raises an inference of intentional discrimination directed at plaintiff because of her sex/gender/motherhood. Plaintiff has come forward with no evidence to support by inference or

otherwise that she was entitled to such a raise.  Winikoff submitted a request for such a raise on

plaintiff's behalf.  In rejecting that request, Mulhern explained on behalf of the Compensation

Committee:

> Stan – The compensation committee decided that Jill's hourly rate should not be raised from $46 per hour.  She will receive the bonus that you and I discussed. Our thinking is that we are making very little, if any, profit from her work when you consider her receipts and the amount we pay her plus some amount of overhead.  Also, there is the issue of her inability to cover events at times because of her part time schedule.  The raises and bonuses for the other associates with whom you work are as you requested.  Barry.

December 29, 2004, email (Doc. No. 34-10) at 1.  And while plaintiff seeks to inject

discriminatory animus into this decision through the Katz comment inquiring about what could

be done to keep plaintiff from coming back from maternity leave because "women loose their

focus after they have babies," there is no competent evidence to support such an approach.  Katz

was not a member of the Compensation Committee, nor is there anything beyond pure

speculation indicating he exercised any direct view over or had any influence on or input into the

setting of plaintiff's hourly rate.  Consequently, his comments do not carry the poisonous venom

claimed by plaintiff and are entitled to little weight in the sufficiency of the evidence analysis

mandated by defendants' motion.  See  Walden v. George-Pacific Corp., 126 F.3d 506, 521 (3d

Cir. 1997) ("Our cases distinguish between discriminatory comments made by individuals within

and those by individuals outside the chain of decisionmakers who have the authority [over the

employee]."); Abramson, 260 F.3d at 286 ("Under our case law, it is sufficient if those exhibiting

discriminatory animus influenced or participated in the [adverse employment decision]"

(collecting cases in support)); Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 545

(3d Cir. 1992) (stray remarks by non-decision makers or even by decision-makers unrelated to

the decision process are minimally probative, particularly where such statements are made in a

context removed from the actual decision-making process); Silver v. American Institute of

Certified Public Accounting, 2006 WL 3511342, *2 (3d Cir. 2006) ("We note that stray remarks

by decision-makers unrelated to the decision-making process, are rarely given weight,

particularly if they are made temporally remote from the date of the decision."); <u>Fletcher v. Lucent Technologies, Inc.</u>, 2006 WL 2844262, *2 (3d Cir. 2006) (same).

Moreover, the explanation advanced by the Compensation Committee was supported by undisputed historical facts. Plaintiff's billable hours for 2004 had dropped by twenty-two percent as compared to her 2003 hours. And at seven hours a day times three days a week, plaintiff's part time position presented an opportunity to generate 1092 hours, less a reasonable amount for maternity leave, down time, vacation, sick leave and so forth. At 470 hours in 2004, the Compensation Committee could well reason that the firm's overall cost of plaintiff's employment was already stretched to maximum capacity. Furthermore, plaintiff's three day a week schedule by necessity created gaps in her ability to cover hearings and events at all relevant times. Such is the nature of part time employment. Thus, the probative value of the Katz's comment is even further diminished with regard to the inquiry at hand. <u>Compare</u> <u>Aman</u>, 85 F.3d at 1083-84 (derogatory remarks coupled with numerous other examples of harassment from co-workers held sufficient to permit a reasonable jury to interpret suspicious remarks from defendant's management as part of a complex tapestry of workplace discrimination directed at plaintiffs because of a protected trait); <u>Spain v. Gallegos</u>, 26 F.3d 439, 447-48 (3d Cir. 1994) (although plaintiff could reference no "blatantly sexist behavior," the first element was satisfied "by showing that gender was a substantial factor in the [claimed] discrimination" and that she would not have been treated in the same manner if she were male).

But even assuming plaintiff's cumulative evidence could be construed as sufficient to permit a finding on the first element, it is insufficient to support findings on the second and fourth elements as well. The Supreme Court has reiterated that "sexual harassment is actionable under Title VII only if it is so severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment." <u>Clark County</u>, 121 S.Ct. 1509; <u>Meritor</u>, 477 U.S. at 67. Conduct which amounts to the "ordinary tribulations of the workplace" such as sporadic use of abusive language, off-handed jokes and occasional taunting and teasing is

beyond the purview of Title VII.  <u>Faragher</u>, 524 U.S. at 788.  Conduct becomes actionable only where it has become sufficiently "extreme to amount to a change in the terms and conditions of employment." <u>Faragher</u>, 524 U.S. at 788.

All of the circumstances surrounding the asserted hostile conduct are to be examined in determining whether a work environment is sufficiently severe or pervasive.  <u>See</u> <u>Harris</u>, 510 U.S. at 23.  The court should assess the objective severity of the harassment and can consider (1) its frequency, (2) its severity, (3) whether it is physically threatening or humiliating (as opposed to an offensive utterance), (4) whether it unreasonably interferes with the employee's work performance and (5) the effect on the employee's psychological well-being. <u>Id.</u>  It is the totality of the circumstances that is critical and no single factor is required or dispositive. <u>Id.</u>  As the Court has opined:

> [t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to social context, will enable courts ... to distinguish between simple teasing or roughhousing ... and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.

<u>Oncale</u>, 523 U.S. at 81-82.  <u>Accord</u> <u>Abramson</u>, 260 F.3d at 279-80 (pervasive requirement is satisfied where the evidence on the environment as a whole "can be found to aggregate to create an environment hostile to a person [sharing the plaintiff's protected trait].") (citing in support <u>Durham Life Ins. Co.</u>, 166 F.3d 155).

When considered under the above standards, plaintiff's evidence falls well short of the mark.  As previously noted, Winikoff's behavior, although inappropriate for a lawyer, did not constitute extreme conduct that could be found to alter the terms and conditions of plaintiff's employment.  And while the setting in which plaintiff works no doubt demands a scrupulous application of discrimination law, the balance of plaintiff's evidence concerning the workplace environment adds little of probative value to support a finding that the environment was pervasively or severely hostile.

While it was rumored that Haggerty occasionally took male clients to gentlemen's clubs, and he admitted as much in his testimony, such conduct was not part of the daily activity that affected plaintiff's work environment. Plaintiff was never required to attend meetings with clients at such clubs and the record is devoid of any evidence indicating that such activity was conducted as a firm event or as part of the firm's agenda. The fact that talk of such activity was heard by plaintiff did not make the activity a concrete event that plaintiff had to endure as part of her work environment, much less a regular and pervasive one.

Plaintiff's complaint concerning Lombard's directive to attend a hearing notwithstanding plaintiff's scheduled doctor's appointment has a similar impact on the cumulative effect of plaintiff's evidence. The record demonstrates that this was a one-time event and plaintiff was not required to cancel any medical appointments as a result of her part time schedule. Furthermore, she had significant fiduciary responsibilities that attached to her representation which cannot be trivialized or simply dismissed as insignificant. That Lombard insisted plaintiff recognize these obligations over other priorities in plaintiff's life on one particular occasion does not make her workplace permeated with severe and abusive hostility toward working mothers.

Similarly, Katz's directive to plaintiff to delete any mention of her part-time working arrangement on her outgoing voice mail message did not impact the terms and conditions of plaintiff's employment. Plaintiff was not told she could not maintain a part-time work schedule or had to do everything that was expected of her full-time working counter-parts. That a management-level partner had reservations about clients becoming aware that their legal affairs were being entrusted to a person working part-time has minimal impact on the environment in which plaintiff was required to work. Requesting that such information not be volunteered to anyone that called is far from fostering an environment that was extreme in demeaning, humiliating and/or belittling plaintiff as a part-time working mother.

The circumstances surrounding the fact that plaintiff did not receive a raise in January of 2005 does not reflect concrete evidence of hostility toward plaintiff as a part-time working

mother.  While plaintiff's recollection is that Winikoff spouted the Katz statement as the reason she didn't get the raise, Winikoff denied making any such statement under oath.  Katz was not a decision-maker at the time and plaintiff has nothing beyond conjecture to support the proposition that he exercised any meaningful influence on the Compensation Committee's decision.  Thus, there is no competent evidence to support the introduction of the Katz statement and its use a trial would be unduly prejudicial.  Beyond plaintiff's effort to color the Compensation Committee's decision with the Katz statement, there is scant evidence in the record to imbue its decision with discriminatory animus.

Considered as a whole, plaintiff's evidence will not support a finding that her working environment was severely or pervasively hostile toward working mothers, notwithstanding the demanding level of compliance that is expected of the profession. Although plaintiff's evidence does span over twenty five months, it is nothing more than a conglomeration of events reflecting the tribulations of the workplace.  It lacks the continuity to be viewed as pervasive and the events simply do not reflect one or more forms of severity that might suffice to demonstrate the extreme conduct or circumstances demanded for a finding of pervasiveness or severity required under the controlling precedent.  Accordingly, defendants are entitled to summary judgement on plaintiff's hostile work environment claim on this basis as well.

Finally, plaintiff's evidence falls short of meeting the objective element as well.  In order to be actionable, workplace conduct must be both objectively and subjectively offensive to violate Title VII.  Faragher, 524 U.S. at 787.  Plaintiff's testimony clearly establishes that she found the environment to be subjectively offensive.  But plaintiff has the burden of proffering sufficient evidence from which the environment can be found to be objectively offense – that a reasonable person in her position would have found the conduct "hostile or abusive."  Clark County, 532 U.S. at 270.  She has not met that burden for essentially the same reasons set forth above.  This basis provides an additional ground entitling defendants to summary judgement on plaintiff's hostile work environment claim.

Although plaintiff's amended complaint sets forth a distinct claim for discrimination based on disparate treatment at count two, she has failed to advance this claim in a manner distinct from her hostile work environment claim. Notwithstanding this lack of clarity, the court assumes that plaintiff has always maintained this claim as viable and distinct from her hostile work environment claim. She has, however, failed to come forward with sufficient evidence to support recovery under this theory as well.

The only discrete act plaintiff has identified that can be construed as standing separate from her hostile work environment claim pertains to her failure to receive a $2.00 per hour raise in January of 2005. Plaintiff asserts and is prepared to testify that Winikoff indicated she would be getting such a raise, and she did not thereafter receive the raise.

A plaintiff may elect to present either direct or indirect evidence to prove a claim of unlawful discrimination. Connors v. Chrysler Fin. Corp., 160 F.3d 971, 976 (3d Cir. 1998). Plaintiff implicitly contends that her compensation claim is based on direct evidence of discriminatory animus by the defendant's decision-makers.

A plaintiff seeking to proceed with a claim of discrimination based on the direct evidence approach "faces a high hurdle." Connors v. Chrysler Financial Corp., 160 F.3d 971 (3d Cir. 1998). "Under the standard announced by Justice O'Conner's controlling opinion in Price Waterhouse v. Hopkins, [490 U.S. 228, 277 (1989)] 'the evidence must be such that it demonstrates that the decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision.'" Connors, 160 F.3d 976. If the plaintiff satisfies this "rigorous" standard, then the burden shifts to the employer to show that it would have made the "same decision even in the absence of the impermissible consideration." Salkovitz v. Pioneer Electronics, Inc.,188 Fed. Appx. 90, 93 (3d Cir. 2006).

Notwithstanding plaintiff's implicit contention that the denial of her $2.00 per hour raise as requested by Winikoff was imbued with discriminatory animus, the record lacks sufficient evidence to support a direct evidence approach on several scores, not the least of which is the

lack of competent proof that the Compensation Committee took into account any protected trait attributable to plaintiff. Because plaintiff lacks sufficient evidence to meet the rigorous standard needed to invoke the Price Waterhouse approach with regard to any adverse employment action brought into question by her complaint, the court will analyze her claim at Count Two using the familiar tripartite approach governing claims based on indirect evidence of discrimination. See Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc) (summarizing tripartite approach).

It is well-settled that claims of discrimination based on circumstantial evidence are to be evaluated at summary judgment using the shifting burdens of proof initially established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). St. Mary Honor Center v. Hicks, 509 U.S. 502, 506 (1993); Waldron v. SL Industries, Inc., 56 F.3d 491, 495 (3d Cir. 1995) (citing Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)). Under this framework the parties' respective evidentiary burdens have been summarized as follows:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facia case of discrimination. Second, if the plaintiff succeeds in proving the prima facia case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the [adverse employment action]. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252-253 (1981) (citation omitted).

Under the indirect evidence approach a plaintiff must present a prima facia case of discrimination. Keller, 130 F.3d at 1108. The major purpose of the prima facia case is to eliminate the most obvious lawful explanations for the defendant's adverse employment action and raise a presumptive inference of discrimination. Pivirotto v. Innovative Systems, Inc., 191 F.3d 344, 352 (3d Cir. 1999) (citing Burdine, 450 U.S. at 253-54 ("[t]he prima facia case serves

an important function in the litigation: it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection.")). A prima facia case raises an inference of discrimination because the presumed circumstances, if left unexplained, indicate it is likely that the defendant's actions were based on consideration of impermissible factors. Id. (quoting Furnco Construction Corp. v. Waters, 438 U.S. 567, 577 (1978)).

There is no talismanic formula for presenting a prima facia case. Jones v. School District of Philadelphia, 198 F.3d 403, 411 (3d Cir. 1999) ("the elements of a prima facia case depend on the facts of the particular case"). The relevant inquiry is whether the plaintiff has suffered an adverse employment action under circumstances which raise an inference of unlawful discrimination. Waldron, 56 F.3d at 494. Plaintiff's burden at this step is "minimal" and is viewed as a means of presenting a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination. Id.; see also Furnco, 438 U.S. at 577.

If the plaintiff presents a prima facia case, the second stage of the McDonnel Douglas paradigm requires the defendant to articulate a legitimate explanation for the adverse employment action at issue. Keller, 130 F.3d at 1108. The defendant's burden at this step is one of production, not persuasion, and the court's consideration of it "can involve no credibility assessment." St. Mary's Honor Center, 509 U.S. at 509. If the defendant meets this burden, the presumption of discrimination created by the prima facia case "drops" from the case. St. Mary's Honor Center, 509 U.S. at 511; Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000).

Once the defendant has met its burden of production and provided a legitimate explanation for its adverse employment action, the court's analysis turns to the third and final step of the inquiry, which is usually the most critical in resolving a motion for summary judgment. Jones, 198 F.3d at 410. At this juncture the plaintiff must be afforded the "opportunity to [present evidence that is sufficient to] prove by a preponderance of the evidence

that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." <u>Burdine</u>, 450 U.S. at 253. At trial, the plaintiff must have evidence that could convince the finder of fact "both that the [defendant's] reason was false, and that discrimination was the real reason." <u>St. Mary's Honor Center</u>, 509 U.S. at 515. This is because while the burden of production under the <u>McDonnell Douglas</u> analysis shifts, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." <u>Jones</u>, 198 F.3d at 410 (quoting <u>Burdine</u>, 450 U.S. at 252-53 (1981)).

In general, a plaintiff may establish a prime facia case by demonstrating that (1) she is a member of a protected class, (2) she was qualified for the position, (3) she suffered an adverse employment action, and (4) the circumstances raise an inference of discrimination, such as where similarly situated individuals outside the protected class were treated more favorably. <u>See</u> <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506, 510 (2002); <u>see</u> <u>also</u> <u>Sheridan v. E. I. DuPont de Nemours & Co.</u>, 100 F.3d 1061, 1066 n. 5 (3d Cir. 1996) (<u>en</u> <u>banc</u>), <u>cert</u>. <u>denied</u>, 521 U.S. 1129 (1997) (discussing nature and purpose of prima facia case). The central focus of the inquiry is always whether the employee is being treated less favorably because of race, religion, sex or national origin. <u>Pivirotto</u>, 191 F.3d at 352 (quoting <u>International Bhd. of Teamsters v. United States</u>, 431 U.S. 324, 335 n. 15 (1977)). The plaintiff ultimately must be able to produce "evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion." <u>Id</u>. at 355. (quoting <u>O'Connor v. Consolidated Coin Caterer's Corp.</u>, 517 U.S. 308, 312 (1996)).

Here, plaintiff has advanced a prima facia case. Plaintiff was a part-time female associate attorney who was told by her supervisor that she would be getting a modest hourly raise. She failed to receive that raise and when she asked her supervisor about the matter a discriminatory comment about working women having babies that was made by a Philadelphia partner was highlighted as the reason she did not receive the raise. All other members of the Pittsburgh

office received the raises requested by the supervisor. Thus, a prima facia case has been presented.

Defendant has proffered a legitimate explanation for the adverse employment action. Winikoff did not have the authority to give plaintiff a raise. The Compensation Committee explained that it viewed plaintiff's work as producing very little profit for the firm, and her part-time schedule created scheduling/staffing difficulties. The statistics reflecting plaintiff's productivity over her 26 months of employment can be construed to support this assessment. Thus, defendant has met its burden of production and the burden shifts back to plaintiff to show defendant's explanation is a pretext for sex discrimination.

Plaintiff has failed to come forward with sufficient evidence to support a finding that defendant's proffered explanation was a pretext for sex discrimination. First, as explained above, the Katz statement is not competent evidence that can be used to impugn defendant's proffered explanation. Second, while plaintiff asserts that she was not given enough work to generate a sufficient level of production throughout 2004, her failure to complain to anyone at the time or raise concerns about the amount of work flowing to her undermines any contention that the assignments were influenced by discriminatory animus. Plaintiff conceded that in 2004 most of the workers compensation assignments came from the Harrisburg office and not from the individuals plaintiff accuses of fostering a hostile work environment.

Plaintiff's contention that her rebuffed efforts at marketing likewise provide evidence of discrimination is misplaced. Plaintiff has not provided any evidence to support the premise that the efforts she used to gain additional clients were appropriate forms of marketing encouraged by defendant and successfully used by any other members of the firm. More importantly, she has not identified any similarly situated comparator who used similar forms of marketing and obtained assistance or financial gain from the firm in conjunction therewith. See Simpson v. Kay Jewelers, 142 F.3d 639, 646-47 (3d Cir. 1998) (The plaintiff has the burden of demonstrating that similarly situated persons were treated differently and in doing so she cannot simply pick and

choose other employees as valid comparators based on criteria of her own liking; instead, "[i]n determining whether similarly situated nonmembers of a protected class where treated more favorably than a member of the protected class, the focus is on the particular criteria or qualifications identified by the employer as the reason for the adverse action."). Without such evidence, the fact that plaintiff offered insight or suggestions in to how she might be better marketed to potential clients and the firm's existing clients, and the fact that defendant never followed up on plaintiff's efforts or implemented her suggestions, are incapable of giving rise to an inference of discrimination.

Plaintiff likewise has failed to offer any evidence to show there was a discriminatory pattern of work assignment during the year under consideration by the Compensation Committee. There is no concrete evidence reflecting  the division of assignments between plaintiff and any similarly situated associate, nor is there evidence suggesting that plaintiff's gender was a substantial or motivating factor in the assignment of workers compensation files prior to January of 2005.

Plaintiff's burden at summary judgement is to proffer sufficient evidence from which the finder of fact may find defendant's proffered explanation for the adverse employment action is unworthy of credence and discrimination was the true reason.  She has failed to meet that burden. Accordingly, defendants are entitled to summary judgement on Count Two.

Plaintiff claims that she was victim of retaliation after she wrote the letter to Mulhern complaining about Winikoff's behavior and her failure to receive a raise in February of 2005. Although plaintiff's amended complaint does not set forth a count for retaliation, plaintiff raised allegations of retaliation in her EEOC charge and the parties have developed the record and addressed these allegations in the matter now pending before the court.  Accordingly, the court will treat plaintiff's amended complaint as containing a claim for retaliation based on the conduct

occurring through the EEOC's investigation following the filing of her June 13, 2005, charge.[1]

In support of her retaliation claim plaintiff notes that defendant did not initiate any formal action on her complaint until April of 2005, almost ninety days after she authored the letter to Mulhern, and Mulhern did not meet with her until May 27, 2005. Plaintiff filed charges with the EEOC shortly thereafter. After Winikoff became aware of plaintiff's charges, he entered her office and yelled at her, not giving her a chance to respond. Thereafter, plaintiff was informed that Winikoff had been demoted and defendant did not renew his contract when it expired in December of 2005. Haggerty announced Winikoff's departure and indicated that his contract was not renewed for a variety of reasons, including plaintiff's lawsuit.

Defendant thereafter appointed Lombard as plaintiff's formal supervisor. Lombard came and reviewed plaintiff's files but did not review the files being handled by Copetas. Copetas received a Lowe's file from Lombard with direction to handle it personally for the purpose of assisting her in developing a budget on the file, and Copetas then announced to the other two associates that per Lombard he was to handle all Lowe's accounts personally. Lombard's written communications were clearly limited to the single file being transfer to Copetas - a new referral on "Terry Destito;" Copetas' followup email implied that there had been a comprehensive assignment of all Lowe's files to him. Plaintiff inquired by email as to whether there was some deficiency in her work that led to Copetas' announcement that he was to handle all Lowe's files, but did not receive a satisfactory answer from Lombard.

Being on December 1, 2004, and thereafter on January 6, 2005, February 7, 2005, March 30, 2005, and March 31, 2005, plaintiff sent emails to Ronald Rietz, Winikoff, Dan Taylor, and

---

[1]Plaintiff's brief in opposition to defendant's summary judgement motion clearly raises a retaliation claim under <u>Burlington Northern & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 126 S. Ct. 2405 (2006). <u>See</u> Plaintiff's Brief in Opposition (Doc. No. 40) at 1, 15, and 28-30. Furthermore, plaintiff contends that a meeting with McCarron occurred while the EEOC investigation was still ongoing, which meeting appears to be the latest specific incident raised by plaintiff in support of this claim. <u>See id.</u> at 15. Thus, all of plaintiff's evidence advanced in support of her retaliation claim properly can be considered.

Argento indicating she was slow and was looking for additional files to review in order to "bill some time." Plaintiff received an email for Argento indicating her review of asbestos files "would be great," but did not receive any additional work as a result of her emails.

Finally, McCarron met with plaintiff and during the conversation the issue of resentment about the lawsuit by plaintiff's co-workers was broached. McCarron queried as to why plaintiff would continue to work at a place where she was resented and plaintiff felt intimidated and believed the conversation was a threat to either drop the suit or quit. McCarron suggested that plaintiff's complaints had been remedied by the firm not renewing Winikoff's contract and he dismissed an attempt by plaintiff to further explore the reported Katz statement, suggesting in the process that men are not able to claim child rearing responsibilities as an excuse.

In order to establish a prima facia case of retaliation under Title VII, a plaintiff must demonstrate that (1) he or she engaged in protected activity; (2) the employer took adverse employment action after or contemporaneous with the protected activity; and (3) a causal link exists between the protected activity and the adverse employment action. Moore v. City of Philadelphia, 461 F.3d 331, 340-41 (3d Cir. 2006); Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997). A claim for retaliation under Title VII is evaluated pursuant to the McDonnell Douglas and Burdine burden shifting analysis highlighted above.

Title VII makes it an unlawful employment practice to discriminate against an employee because the employee has made a charge of discrimination. Slagle v. County of Clarion, 435 F.3d 262, 266 (3d Cir. 2006) (Anti-retaliation provision protects those who participate in certain Title VII proceedings and those who oppose discrimination believed to be unlawful under Title VII.). Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997); 42 U.S.C. § 2000e-3(a). It also protects employees who oppose discrimination through "informal protests of discrimination practices, including making complaints to management." Curay-Cramer v. Ursuline Acad. of Wilmington, 450 F.3d 130, 135 (3d Cir. 2006). The employee must hold an objectively reasonable belief, in good faith, that the challenged activity violates Title VII. Clark

County, 532 U.S. at 271.

The scope of Title VII's anti-retaliatory provision is broader than its anti-discrimination provision. Burlington Northern, 126 S. Ct. at 2414. It protects an employee from "retaliation that produces an injury or harm." Thus, its protections extend to all forms of retaliatory action that are "materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Id. at 2415 (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006) and Washington v. Illinois Dept. of Revenue, 420 F.3d 658, 662 (7th Cir. 2005)).

Although it protections are broad, the anti-retaliatory provision does not protect an employee from all forms of retaliation. Requiring a plaintiff to show "material adversity" serves the important purpose of separating "significant from trivial harms." Id. at 2415. Such an approach is necessary because, as previously noted, the Court has repeatedly emphasized that Title VII "does not set forth 'a general civility code for the American workplace.'" Id. (quoting Oncale, 523 U.S. at 80; and citing Faragher, 524 U.S. at 788 (judicial standards for sexual harassment must "filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing' ")). In other words, "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." Id. (citing 1 B. Lindemann & P. Grossman, Employment Discrimination Law 669 (3d ed.1996) (noting that "courts have held that personality conflicts at work that generate antipathy" and " 'snubbing' by supervisors and co-workers" are not actionable under § 704(a))); see also Jensen, 435 F.3d at 451 ("[Title VII] does not mandate a happy workplace.").

The above standards for judging harm are to be administered from an objective point of view. Id. The court is not to delve into the subjective feelings of the employee. Id.

In utilizing the objective standard close attention is to be paid to context. "Context matters." Id. It is important to recognize that "[t]he real social impact of workplace behavior

often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." Id. (quoting Oncale, 523 U.S. at 81-82). A work schedule change "may make little difference to many workers, but may matter enormously to a young mother with school age children." Id. (citing in support Washington, 420 F.3d at 662 (finding flex-time schedule critical to employee with disabled child)). Similarly, "[a] supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination." Id. at 2416 (citing 2 EEOC 1998 Manual § 8, p. 8-14).

The record also must contain sufficient evidence from which the finder of fact can link the materially adverse action to retaliatory animus. Moore, 461 F.3d at 346. Two central factors are brought into play: (1) the "temporal proximity" between the protected activity and the alleged retaliation and (2) the existence of any " 'pattern of antagonism in the intervening period.' " Id. (quoting Abramson, 260 F.3d at 288 (quoting Woodson, 109 F.3d at 920-21). "Timing alone raises the requisite inference when it is "unusually suggestive of retaliatory motive." Id. "But even if 'temporal proximity ... is missing, [it is appropriate to] look to the intervening period for other evidence of retaliatory animus." Id. (quoting Krouse v. American Sterilizer Co., 126 F.3d 494, 503-04 (3d Cir.1997)). However, "[t]hese are not the exclusive ways to show causation" and it is important to consider all of the proffered evidence as a whole to determine whether it "may suffice to raise the inference." Id. (quoting Farrell, 206 F.3d at 280 and citing in support Kachmar v. SunGard Data Systems, Inc., 109 F.3d 173, 178 (3d Cir.1997) ("The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific.")).

Finally, if the plaintiff proffers sufficient evidence to establish a prima facia case, the burden shifts to defendant to advance a legitimate explanation for any treatment brought into

question. If the employer meets that burden, plaintiff must come forward with sufficient evidence to "overcome the non-retaliatory explanation" and permit a finding of retaliatory discrimination. Id.

The first element is not in question because plaintiff made an informal complaint to management in February of 2005 and filed a charge of discrimination with the EEOC on June 13, 2005. Furthermore, the record does not demonstrate as a matter of law that plaintiff could not have held an objectively reasonable belief in good faith that the challenged activity did not violate Title VII. Thus, it is appropriate to consider the conduct occurring after plaintiff made her informal complaint pursuant to the standards governing the second and third elements.

Plaintiff's evidence of retaliation consists of (1) defendant being slow to acknowledge and investigate her complaint; (2) being yelled at by Winikoff after he learned of plaintiff's complaints of sexual harassment; (3) Haggerty announcing Winikoff's departure and indicating it was for a variety of reasons, including plaintiff's lawsuit; (4) having Lombard review the files assigned to plaintiff but not reviewing those assigned to Copetas; (5) Copetas announcing to members of the Pittsburgh workers compensation unit that he was to handle all Lowe's cases and Lombard failing to answer plaintiff's inquiry as to whether some inadequacy in her work had lead to that arrangement; (6) failing to receive additional work as a result of pre-complaint emails indicating plaintiff was a little slow and was looking for additional work; and (7) McCarron being unwilling to consider plaintiff's report of the Katz statement as accurate and serious and suggesting that plaintiff was resented by her colleagues and implying that she should drop the suit or resign.

Much of plaintiff's evidence of retaliation fails to amount to more than trivial annoyances and petty slights that commonly take place in the workplace. While Winikoff did enter plaintiff's office and yell at her after learning of the substance of her EEOC charge, plaintiff has failed to identify any retaliatory action thereafter taken or directed by Winikoff. Being yelled at by a supervisor for making a complaint about gender-derogatory jokes contained in past emails

and failure to receive a raise, while inappropriate and no doubt unpleasant, does not reflect materially adverse action. See Nagle v. RMA, The Risk Mgmt. Ass'n., 513 F. Supp.2d 383, 391 (E.D. Pa. 2007) (holding that plaintiff's "heated," 65 minute meeting with her supervisor and human resources officer, which left plaintiff believing her career was over and suffering from emotional distress, did not constitute a materially adverse action).

McCarron's conversation with plaintiff is conduct of the same nature. Title VII does not mandate that a complaining employee be treated to a pleasant and conflict free workplace. McCarron suggesting that plaintiff's colleagues resented her and questioning whether she should continue with the lawsuit or resign under such circumstances was inappropriate and would make any employee uncomfortable. But no materially adverse action was attached to or has been connected with that communication, and merely experiencing some apprehension and subjectively feeling intimidated from such a conversation hardly amounts to the type to measures that the courts have found sufficient to support a claim of retaliation. Compare Moore, 461 F.3d at 346-49 (supervisor promising to make a police officer's life "a living nightmare" if he filed EEOC charges, followed by the imposition of discipline – being stripped of his weapon, having duties changed negatively, being ordered to undergo a psychiatric evaluation, receiving a 30-day suspension and being transferred from the district – for commenting on perceived discrimination by another supervisor against minority workers, could be found by jury to be materially adverse action caused by retaliatory animus, notwithstanding legitimate reasons for imposing some of the discipline; officer who opposed treatment of minority officers and was assaulted by a fellow officer 15 minutes after supervisor threatened to "kick" the employee's ass, and then transferred for employee's own safety and the safety of other officers and the public, after being ordered to stand in the rain along side of minority officer to "see how its like to work with a nigger" and given an unsatisfactory performance review provided sufficient evidence to have jury consider retaliation claim; officer who within two weeks of also receiving "living nightmare" threat from supervisor was separated from two supporting officers in squad, stopped receiving court notices

without explanation, disciplined falsely for attempting to contact superior on a holiday, and had superior become personally involved in employee's custody battle set forth a "pattern of harassment [that] might dissuade a reasonable worker from bringing or supporting a charge of discrimination."); Burlington Northern, 548 U.S. at (reassignment of female employee to less desirable position after she complained about demeaning treatment from immediate supervisor with explanation that it "reflected co-worker's complaints that, in fairness, a 'more senior man' should have the 'less arduous and cleaner job' of forklift operator" and 37 day suspension for insubordination that was grieved and found to be unwarranted reflected independent grounds for jury finding of materially adverse action taken in retaliation); Phelan v. Cook County, 463 F.3d 773, 787 (7th Cir. 2006) (employee's denial of medical leave of absence and termination for unauthorized absence following her complaints of coworker and supervisor harassment notwithstanding her recent favorable job performance reviews constituted materially adverse action that could be found to be a prohibited act of retaliation).

Haggerty announcing Winikoff's departure and indicating that it was for a variety of reasons, including plaintiff's lawsuit, similarly lacks any impact in establishing probative evidence of materially adverse action. While plaintiff may have preferred not to have her publicly filed EEOC charge mentioned in conjunction with Winikoff's departure, Title VII is not offended by the disclosure of such innocuous and neutral information. Defendant's willingness to attribute plaintiff's charges as one of a number of causes leading to the decision not to renew Winikoff's contract added credence to and bolstered the seriousness of plaintiff's complaints of discrimination. If anything, a jury would have to acknowledge that such conduct reinforced the proposition that complaints about sexual harassment would be taken seriously. There is virtually no evidence that such conduct was aimed at intimidating plaintiff and making her apprehensive about losing her job or suffering future retaliatory action.

Lombard's review of plaintiff's files cannot be causally linked to any meaningful form of retaliation. Plaintiff made it known before she made an informal complaint about Winikoff's

behavior and not receiving a raise that she had a light work load and was in need of additional work. After plaintiff's informal complaint was received Winikoff was removed as plaintiff's direct supervisor and Lombard, who was the head of defendant's workers compensation department, was placed in charge of supervising plaintiff. That she would thereafter have to become familiar with plaintiff's work and assure that matters were being adequately undertaken by reviewing the files assigned to plaintiff, particularly after her yearly hours were down twenty two percent and she indicated she did not have enough work, is nothing more than the type of inconvenience and petty slight that any employee might experience as part of an investigation and determination of the cause(s) of plaintiff not having sufficient work to fill her part-time schedule. Lombard's failure to review Copetas' files at that time is hardly the type of humiliating, embarrassing or annoying harm that appropriately can be found to be significant, let alone a form of significant harm that can be causally linked to retaliatory animus.

Plaintiff's failure to receive more affirmative responses to her internal "marketing" efforts and Lombard's failure to respond specifically to plaintiff's inquiry concerning the Lowe's files are not capable of being perceived as retaliatory measures. First, plaintiff's offers to take on work outside her assigned area were not measures a part-time associate was expected to do or ones that partners or other associates were expected to help facilitate. Argento did respond in a positive manner and the record lacks any affirmative evidence indicating plaintiff thereafter attempted to followed up on his response. Winikoff had already been facilitating the acquisition and assignment of workers compensation matters for the firm and there is no indication he withdrew that support during his remaining tenure in a manner detrimental to plaintiff. Nor is there any evidence suggesting that Lombard did so. To the contrary, plaintiff's 2005 billable hours surpassed her 2003 level by about 13.5 percent and her 2004 level by 48 percent. Plaintiff continued to maintain her part-time three day a week status and thus there is no basis to infer that the assignment of work was being withheld from her as a retaliatory measure.

Moreover, there is no basis in the record from which the finder of fact can conclude that

Lombard's asking Copetas to handle the Destito file in order to develop a budget equated to a materially adverse action undertaken as a retaliatory measure. Plaintiff fails to explain or advance any evidence to support the proposition that such an assignment was meaningfully detrimental to the advancement of her work or position at the firm. Compare Hare v. Potter, 220 Fed. Appx. 120, 129 (3d Cir. 2007) (failure to select employee for Career Management Program designed to fast-track employees with leadership skills into management positions four days after meeting stemming from prior incident of sexual harassment reflected "materially adverse action"). There is no evidence that such files were considered to be premium or easier forms of work. And even assuming the directive from Lombard is to be read as applying to all future Lowe's files, plaintiff has presented no meaningful evidence to prove that giving such responsibility to a full-time associate can and should be viewed as something the average or a similarly situated part-time associate would view negatively or that the assignment of such responsibilities to another associate under all the attendant circumstances would dissuade a reasonable worker from making or supporting a charge of discrimination. See Morrison v. Carpenter Technology Corp., 193 Fed. Appx 148, 154 (3d Cir. 2006) (there must be some basis to infer injury or harm from employer's action in order for it to qualify as materially adverse).

The aggregate effect of all retaliatory measures identified by plaintiff falls short of providing sufficient probative evidence from which the finder of fact can find that plaintiff was the victim of a tapestry of retaliatory discrimination. To be sure, plaintiff has provided evidence that she perceived the post February 2005 environment to be riddled with retaliatory measures that made her feel intimidated, ostracized and humiliated. But merely identifying a number of workplace events that make an employee feel uncomfortable is not enough. Compare Weger v. City of Ladue, 500 F.3d 710, 727 (8th Cir.2007) ("Fourth, the fact that Plaintiffs felt ostracized by Chief Wickenhauser and other officers falls short of Burlington Northern's materially adverse standard because Plaintiffs did not suffer significant harm.") with Moore v. KUKA Welding Sys. & Robot Corp., 171 F.3d 1073, 1080 (6th Cir.1999) (intentionally isolating employee following

34

the filing of a discrimination complaint by instructing "the other employees not to talk to him, go into his area or otherwise interact with him" constituted actionable retaliation). The identified retaliation must be materially adverse from an objective perspective and there must be an adequate evidentiary basis to attribute a retaliatory motive as the cause of such adverse measures. And the plaintiff's evidence as a whole must be capable of supporting a finding that the defendant's explanations advanced for any materially adverse action are a pretext for retaliation. The cumulative impact of plaintiff's evidence fails to meet these standards for essentially the same reasons noted above. Accordingly, defendant is entitled to summary judgement plaintiff's claim of retaliation as well.

Finally, while plaintiff's evidence of retaliation is to be considered separately from "the nature of the discrimination that led to the filing of the charge," Burlington Northern, 126 S. Ct. at 2416, the aggregation of plaintiff's retaliatory evidence with her other evidence of the pre-complaint environment does not rectify the insufficiency of the evidence as a whole to support a finding that her work environment was sufficiently extreme to amount to a change in the terms and conditions of employment. An incident involving a supervisor yelling at the employee about the allegations raised in an EEOC charge and another separate incident of a supervisor suggesting the charging employee should consider the negative perceptions of coworkers and collogues in considering any contemplated course of future action without more reflect conduct that falls within "the ordinary tribulations of the workplace." To be sure, the subject matter of these incidents adds force to the impact they would be expected to have on the hostility and retaliatory nature of a charging employee's environment. And acting on such emotions to the detriment of the employee in any meaningful way would almost surely satisfy the materially adverse element in a retaliation claim. But Title VII does not mandate that supervisors and managers maintain absolute emotional sterility with regard to an employee's protest or opposition to perceived discriminatory practices. Something beyond such isolated verbal mistreatment is needed to convert what was otherwise an occasionally unpleasant environment

into an actionable one. And a supervisor reviewing an employee's work on assigned matters and/or decisions on how and/or to whom work should and will be assigned, without any further measures detrimentally effecting the employee's earnings, workload or ability to complete the work competently and successfully does not supply the missing negative or detrimental impact needed to make the environment severely or pervasively hostile. Consequently, it follows that defendant remains entitled to summary judgement on plaintiff's hostile work environment claim after all evidence of record concerning defendant's conduct is taken into account.

Date: February 29, 2008


s/ David Stewart Cercone
David Stewart Cercone
United States District Judge


cc:     Joel S. Sansone, Esquire
        Scanlon & Sansone
        2300 Lawyers Building
        Pittsburgh, PA 15219

        Patricia A. Monahan, Esquire
        Danielle M. Vugrinovich, Esquire
        Marshall Dennehey Warner Coleman
           & Goggin
        Suite 2900, U.S. Steel Tower
        600 Grant Street
        Pittsburgh, PA 15219